DONALD W. SEARLES (Cal. Bar No. 135705)
Email: searlesd@sec.gov
COLLEEN KEATING (Cal. Bar No. 261213)
Email: keatingc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Brent W. Wilner, Associate Director
Stephen Kam, Supervisory Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>OMAR DARIO CHAVEZ, a/k/a OMAR AIDEN CHAVEZ,<br><br>Defendant. | Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Section 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1), 77v(a)], Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa(a)], and Sections 209(d), 209(e)(1) and 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) and 80b-14].

2. The Defendant Omar Dario Chavez, a/k/a Omar Aiden Chavez ("Chavez") has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14], because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

4. Between October 2022 and March 2025 Chavez induced at least 16 individuals to give him nearly $1 million to trade in securities on their behalf as their investment adviser. Chavez defrauded those individuals, including several elderly investors, by portraying himself as a successful stock trader who achieved monthly returns of 10 to 20 precent by following "safe" and "conservative" trading strategies.

5. To convince his victims of his trading acumen, Chavez claimed that he had amassed $1 to $2 million in his own brokerage accounts, which he said would be

used to guarantee the return of his clients' monies. Chavez also presented some of his clients with doctored images falsely depicting large positive balances in his personal brokerage accounts. After obtaining money from his clients, Chavez reported fictitious "profits" to his clients on a monthly basis, luring many of them to entrust even more money with him.

6. Chavez also presented his clients with a "consulting agreement" in the name of Lucky Ones, LLC ("Lucky Ones"), an entity that he represented as being "registered," to provide financial consulting services in exchange for a monthly performance fee and quarterly management fee. Chavez also told some of his clients that he had consulted an attorney, an employee of a broker-dealer, and a certified public accountant in connection with the operation of his business.

7. None of this was true. In executing securities transactions on behalf of his clients, Chavez racked up hundreds of thousands of dollars in trading losses, which he concealed from his clients. Chavez admitted during the course of the SEC's investigation that the monthly profits he reported to his clients were fake, and that his claim that he had millions of dollars in his personal brokerage accounts was false. Chavez also admitted that Lucky Ones was never registered and that he had not consulted with any professionals.

8. In addition to placing highly risky trades on behalf of his clients, in the form of day trading short-dated option trades on margin, Chavez also admitted that he had commingled his clients' funds in his own personal bank accounts and used his clients' funds to pay his personal expenses and to pay back other investors.

9. By engaging in this conduct, Chavez violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Section 17(a) of the Securities Act, and Sections 206(1) and 206(2) of the Advisers Act.

## THE DEFENDANT

10. **Chavez**, age 41, resided in Los Angeles, California through at least July 2025. He has never been associated with a registered broker-dealer or investment

adviser and does not hold any securities licenses.

## RELATED ENTITY

11. Lucky Ones, LLC, is a California limited liability company that was solely owned and controlled by Chavez. Chavez sent clients and prospective clients "consulting agreements" in the name of Lucky Ones, in which he offered to provide fee-based investment advisory services.

## CHAVEZ'S FRAUD

### A. Chavez Portrayed Himself to Potential Clients as a Successful Trader

12. In attempting to solicit clients through in-person communications, text messages, and communications through social media, Chavez portrayed himself as a successful trader who was making monthly profits of 10 to 20 percent and had accumulated $1 million to $2 million in his personal brokerage accounts.

13. In these communications, Chavez offered to trade securities on their behalf representing that he was already managing significant investments of his parents' and brother's money to encourage prospective clients to invest with him.

14. To corroborate his claim of trading profits and personal wealth, Chavez sent purported photos of his brokerage account balances to some of these clients, which Chavez altered to falsely depict large positive account balances.

15. For example, on April 24, 2023, he sent text messages to a 72-year-old client who was considering entrusting him with additional funds. Chavez represented that he was investing his parents' money, adding "[s]o trust that I am very cautious with trading." Two days later that client gave Chavez another $100,000, withdrawn from her IRA, to invest in securities on her behalf. She told Chavez that this was "all the money [she] ha[d] in the world."

16. In another example, on February 3, 2024, Chavez sent a text message to a prospective client claiming: "Some months I make 17% profit, some it's 12%. Lowest average is 10% and highest months have been 22%." After this individual

sent Chavez funds to trade securities on his behalf, Chavez encouraged him to entrust him with additional money, texting the client on March 3, 2024 that he had a brokerage account "with about $2mill as insurance."

17. On February 21, 2024, Chavez sent a message to another potential client that falsely stated: "And if you do decide to invest, I usually make like 12%-20% gains every month on conservative trades."

18. On November 18 and 19, 2025, Chavez exchanged Instagram messages with a potential client who told him that she had been through extensive cancer treatment and that she wanted to "make sure I [can] financially take care of my kids." Chavez responded: "Well let's hurry up and get you rich," and touted his average monthly returns of 10-20% on "safe" trades. Chavez further represented that he had paid out every previous investor, all of whom "came out with a lot more than they started with."

19. To further embellish his credentials, Chavez also sent text messages to prospective clients in January and February 2024 that he had a "registered" company that operated as a "trading club."

20. Chavez also told some clients that he had consulted an attorney, an employee of a broker-dealer and a certified public accountant regarding his business. In at least one instance, Chavez told a client that he had a "license" to trade securities or had his "brokerage certification."

**B. Chavez Sent Consulting Agreements to Clients**

21. Chavez prepared and sent to several of his clients and prospective clients Lucky Ones consulting agreements through email.

22. The consulting agreement, which Chavez signed on behalf of the company, described Lucky Ones as a "registered company" that provided "financial consultation and direction regarding but not limited to stock market conditions and economic conditions."

23. The agreement also represented that Chavez/Lucky Ones would trade

securities on behalf of the client in exchange for a monthly performance fee of up to 25% of trading profits, together with a 1-3% management fee on the client's total amount held in the "brokerage fund" payable on a quarterly basis.

24. In at least one instance, a client paid the performance and management fees directly to Chavez, but in most instances clients directed Chavez to deduct the advisory fees from their monthly "profits."

**C. Chavez Told Clients They Had Achieved Large Gains**

25. After procuring their investments, Chavez sent monthly account summaries to his clients, depicting large positive monthly gains – often double-digit percentages – that they had purportedly made by Chavez trading securities on their behalf.

26. For example, Chavez sent a monthly account summary purportedly showing that a client had made 15% in gains for May 2023.

27. Those monthly account summaries induced several of Chavez's clients to provide additional money to him to trade on their behalf.

**D. Chavez Represented that He Could Protect His Clients From Investment Losses and Guaranteed Large Profits**

28. Chavez told clients and prospective clients that he would use the large positive balances in his personal brokerage and/or bank accounts as "insurance" to compensate for any potential losses, guaranteeing that his clients would not lose money.

29. For example, in early 2025 Chavez convinced an investor to send him approximately $120,000 to trade securities on her behalf. To address that investor's concern that she was financially desperate and could not afford a risky investment, Chavez included a guarantee against any loss of principal in his consulting agreement, even though he had been unable to repay other investors who had requested the return of their funds.

30. As another example, in a March 4, 2023 text message to a client who

was considering sending him additional money to invest, Chavez promised: "every month will be green. That's one thing I can guarantee. . . never red."

**E. Chavez Misappropriated Client Funds**

31. In total, Chavez collectively raised approximately $940,378.93 from his clients.

32. At Chavez's instruction, his clients generally sent their funds to Chavez's personal bank account, where he commingled their money with his own.

33. In one case, a client sent his money to a bank account in the name of Lucky Ones, and Chavez immediately transferred the funds to his personal account without disclosing this to the investor.

34. In another case, after convincing the "financially desperate" client to transfer approximately $120,000 to him, Chavez misappropriated significant amounts of the client's money. The client lost her entire investment.

35. Chavez transferred some client funds to his personal brokerage accounts for trading under his own name.

36. Chavez also misappropriated client funds to pay his personal expenses, including rent, credit card bills, repayments on short-term personal loans, and payments to other investors.

**F. Chavez's Representations to Clients Were False and Material**

37. Contrary to what he told his clients, Chavez did not make 10% to 20% a month in trading profits. Chavez incurred approximately $135,000 in net trading losses in 2022, $470,000 in net trading losses in 2023, and $63,000 in net trading losses in 2024, for total net trading losses during the relevant period of approximately $668,000.

38. Contrary to what Chavez told his clients, neither his parents nor his brother had given him any money to trade securities on their behalf.

39. Moreover, Chavez did not have $1 to $2 million in his personal brokerage accounts.

40. Chavez also doctored photos of his personal brokerage account balances to deceive his clients into thinking he was a successful trader, and falsely portraying that he had sufficient available funds to guarantee a return of his clients' investments.

41. Chavez simply made up the numbers in the monthly account summaries he provided to his clients to falsely portray that the clients were making monthly gains through the trading he was conducting on their behalf.

42. Chavez had not "paid out" every client and his statement to a potential client that "all came out with a lot more money than they started with" was false.

43. Chavez had not consulted with any attorneys, broker-dealers, or certified public accountants in connection with his business of trading securities on behalf of others.

44. In testimony with the SEC, Chavez admitted to knowingly making each of these false statements to clients and prospective clients.

45. It would have been important to a reasonable person in deciding whether to provide money to Chavez and/or Lucky Ones to trade in securities on his or her behalf to know that each of Chavez's aforementioned representations was false.

**G. Chavez Acted as an Investment Adviser**

46. During the relevant period, Chavez, both individually and through his company, Lucky Ones, acted as an investment adviser who, for compensation, engaged in the business of advising others as to the value of securities, and the advisability of investing in, purchasing or selling securities.

47. That compensation consisted of both the performance and management fees clients expected to pay Lucky Ones and Chavez under the Lucky Ones consulting agreement, as well as the client funds that Chavez misappropriated for his own personal use.

**H. Chavez Used the Means and Instrumentalities of Interstate Commerce**

48. Chavez communicated with his clients and potential clients, who resided

in multiple states including California and Colorado, through e-mail, text messages, WhatsApp, and social media.

49. In addition, in trading and offering to trade securities on his clients' behalf, Chavez used bank wires and other instrumentalities of interstate commerce.

## FIRST CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

50. The SEC realleges and incorporates by reference paragraphs 1 through 49 above.

51. In connection with the purchase and sale of securities, Chavez defrauded his clients and potential clients by falsely portraying himself as a successful stock trader and financial consultant, creating and using false brokerage account statements, and misappropriating client funds for his personal use.

52. Chavez also made false and misleading statements to his clients and prospective clients, including statements relating to the 10% to 20% returns he was purportedly achieving, that he had available funds to guarantee no loss of principal to his clients, and that he had consulted with outside professionals in connection with his advisory business.

53. By engaging in the conduct described above, Chavez, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly and/or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

54. By engaging in the conduct described above, Chavez violated, and

unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**SECOND CLAIM FOR RELIEF**

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a) of the Securities Act**

55. The SEC realleges and incorporates by reference paragraphs 1 through 49 above.

56. In trading securities on behalf of his clients and prospective clients, Chavez falsely portrayed himself as a successful stock trader and financial consultant, created and used false brokerage account statements, and misappropriated client funds for his personal use.

57. Chavez also made false and misleading statements to his clients and prospective clients, including statements relating to the 10% to 20% returns he was purportedly achieving, that he had available funds to guarantee no loss of principal to his clients, and that he had consulted with outside professionals in connection with his advisory business.

58. By engaging in the conduct described above, Chavez directly or indirectly, in the offer or sale of securities, and by the use of means or instrumentalities of interstate commerce or of the mails: (a) knowingly and recklessly employed devices, schemes, or artifices to defraud; (b) knowingly, recklessly and/or negligently obtained money or property by means of untrue statements of material facts and omission to state material facts necessary in order to make the statements made, in light of the circumstances under which they made, not misleading; and (c) knowingly, recklessly and/or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

59. By engaging in the conduct described above, Chavez violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C.

§ 77q(a).

## THIRD CLAIM FOR RELIEF

### Fraud by an Investment Adviser

### Violations of Sections 206(1) and 206(2) of the Advisers Act

60. The SEC realleges and incorporates by reference paragraphs 1 through 49 of this Complaint

61. Chavez, at all relevant times, was an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

62. In connection with his advisory business, Chavez falsely portrayed himself as a successful stock trader and financial consultant, created and used false brokerage account statements, and misappropriated client funds for his personal use.

63. By engaging in the conduct described above, Chavez, by the use of the mails, and means and instrumentalities of interest commerce, directly or indirectly, knowingly or recklessly employed a device, scheme and artifice to defraud his clients and prospective clients, and knowingly, recklessly or negligently engaged in transactions, practices, and a course of business which operates as a fraud or deceit upon his clients and prospective clients.

64. By engaging in the conduct described above, Chavez violated, and unless restrained and enjoined, will continue to violate Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Chavez committed the alleged violations.

**II.**

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Chavez from violating Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder, [17 C.F.R. § 240.10b-5]; and Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) & 80b-6(2)].

**III.**

Enter an order permanently restraining and enjoining Chavez from, directly or indirectly, acting as or being associated with any investment adviser, broker or dealer. For purposes of this paragraph: (a) a person is associated with an investment adviser if such person is a partner, officer or director of such investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser; and (b) a person is associated with a broker or dealer if such person is a partner, officer, director or branch manager of such broker or dealer (or occupies a similar status or performs similar functions), directly or indirectly controls, is controlled by, or is under common control with such broker or dealer, or is an employee of such broker or dealer.

**IV.**

Order Chavez to disgorge the ill-gotten gains received because of his violations alleged in this complaint, together with prejudgment interest thereon.

**V.**

Order Chavez to pay a civil penalty under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

///

**VII.**

Grant such other and further relief as this Court may determine to be just and necessary.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby demands a trial by jury on liability.

Dated: September 3, 2026

*/s/ Donald W. Searles*
Donald W. Searles
Attorney for Plaintiff
Securities and Exchange Commission